# In the United States District Court
# for the Southern District of Georgia
# Waycross Division

DEBRA L. HARRIS,

    Plaintiff,

    vs.

PIERCE COUNTY, GEORGIA; PIERCE
COUNTY BOARD OF COMMISSIONERS;
PAUL CHRISTIAN, individually
and in his official capacity as
County Manager; JAMES SPIVEY,
individually and in his
official capacity as Emergency
Medical Services Director;
EDWARD CADY, individually and
in his official capacity as
Human Resources Director;
OKEFENOKEE EMERGENCY MEDICAL
SERVICE, INC.; DEREK MALLARD,
individually and in his
official capacity as
Owner/Director of Okefenokee
Emergency Medical Service,
Inc.,

    Defendants.

CV 513-82

## ORDER

Presently before the Court are Defendants Mallard and

Okefenokee Emergency Medical Service, Inc.'s Motion to Dismiss

Plaintiff's Complaint, Dkt. No. 6, and their Motion to Dismiss

Plaintiff's Amended Complaint, Dkt. No. 41. Upon due

1

consideration, Defendants' first motion is **MOOT,** and their second motion is **DENIED IN PART** and **GRANTED IN PART.**

## I. Factual Background

### A. History Prior to Problems

This case is predicated upon county officials allegedly retaliating against a government employee for speaking against privatization of a government agency.[1] Plaintiff Debra Harris worked for Pierce County for more than six years—from March 6, 2006 until August 27, 2012. Dkt. No. 36 ¶ 15. During her tenure, she worked as a secretary and billing clerk for the Pierce County Emergency Medical Services ("County EMS") and as a secretary for multiple other county agencies. Id.

At all times while employed with the County, Plaintiff was qualified and able to perform the essential job functions for a secretary and billing clerk. Id. ¶ 16. In her capacity as the billing clerk for County EMS, Plaintiff was responsible for intake and processing of the "run information" necessary to bill patients or their insurers. Id. She was solely responsible for transmitting the "run information" to EMS Consultants, a third party that carried out the actual billing. Id. Plaintiff's position also required her frequently to perform quality assessments on the personal information provided for billing

---

[1] For the purposes of Defendants' motions to dismiss, the allegations in Plaintiff's Amended Complaint, Dkt. No. 36, are taken as true. McKinley v. Fed. Home Loan Mortg. Corp., No. CV 212-124, 2013 WL 4501327, at *2 n.1 (S.D. Ga. Aug. 22, 2013).

AO 72A
(Rev. 8/82)

purposes.  Id.  During Plaintiff's employment with Pierce County, and up until August 8, 2012, Plaintiff's immediate supervisor was Ken Justice, who was Director of County EMS.  Id. ¶ 17.

B. New County Leadership and Talk of Privatization

On July 5, 2011, Defendant Paul Christian became County Manager for Pierce County.  Id. ¶ 18.  Christian began to explore the possibility of privatizing County EMS.  Id. ¶ 19. Pursuant to that "possibility," he had discussions with Defendant Derek Mallard.  Id.  Mallard owns Defendant Okefenokee Emergency Medical Service, Inc. ("Private EMS") and wanted to contract with Pierce County to assume private operation of County EMS.  Id.  These discussions concerned not only the potential for a takeover, but what benefits Pierce County would receive in return.[2]  Id. ¶ 24.

In October 2011, Christian, while speaking to the local Rotary Club, espoused his desire to privatize County EMS, which a local paper reported.  Id. ¶ 18.  In response, Justice

---

[2] Plaintiff has attached exhibits to her Complaint to support the existence and substance of these conversations.  For example, on September 13, 2011, Mallard and Christian exchanged emails.  Dkt. No. 36-2, Ex. B.  Mallard concluded the exchange with an email that noted his availability if he needed to "answer any questions or if [Christian felt that Mallard] need[ed] to meet with anyone before [Mallard] le[ft]."  Id.  Moreover, in a deposition of Edward Cady, Pierce County's Human Resources Director, conducted pursuant to a related case, Cady testified that he overheard conversations between Christian and Mallard in which they discussed Private EMS's potential services and privatizing County EMS.  Dkt. No. 36-4, Ex. D, at 76, 80-82. Cady also testified that Christian wanted to discuss privatization and meet outside of Pierce County, assumingly because Christian "didn't want to be seen."  Id. at 80-81.

AO 72A
(Rev. 8/82)

expressed his vehement opposition to the plans for privatization.  Id. ¶ 20.  On October 5, 2011, Mallard emailed Christian and said, "I wanted to drop you a quick line and let you know I am back in town.  I saw the article in the paper.  I guess Ken [Justice] is getting nervous.  If you need anything from me just let me know."  Dkt. No. 36-3, Ex C.

C. Initial Opposition to Privatization and Removing Justice

On November 22, 2011, Defendant Pierce County Board of Commissioners conducted a work session meeting.   Dkt. No. 36 ¶ 21.  There, Dave Wills, an agent of the Association County Commissioners of Georgia, pitched conducting an assessment of County EMS.  Id.  The proposed assessment[3] would evaluate County EMS's finances and operation, which would lead to recommendations meant to improve County EMS's operational efficiency and economy.  See id.  On December 6, 2011, the Board of Commissioners approved the proposed evaluation and agreed that, pending the completion of the state evaluation, there would be no decisions about privatizing County EMS.[4]  Id. ¶ 22.

In February 2012, at a Board of Commissioners meeting, Christian unsuccessfully attempted to remove Justice from certain positions of authority.  Id. ¶ 23.  A large crowd of

---

[3] The assessment would be conducted by the Georgia Office of Emergency Medical Services and Trauma.  Dkt. No. 36 ¶ 21.
[4] The state evaluation did not occur until June 24-27, 2012.  Dkt. No. 36 ¶ 22.

fire personnel, EMS personnel, and others appeared at the meeting to support Justice. Id. Plaintiff was also there. Id. To several individuals in attendance, she expressed her support for Justice, her opposition to his removal, and her opposition to privatizing County EMS. Id. On several additional occasions, Plaintiff communicated to Defendant James Spivey, a County EMS employee, her opposition to plans for privatization. Id. ¶ 25.

D. August 8th and Justice's Suspension

On the morning of August 8, 2012, Christian placed Justice on administrative leave from his position as Director of County EMS, purportedly for pretextual reasons. Id. ¶ 26. Upon learning of this, Plaintiff told Spivey and Leonard Roberts, the County's 911 Director, about her objections to Justice's suspension. Id. She continued to express her objections—in the presence of Spivey and Edward Cady, Pierce County's Human Resource Director—as Justice was escorted by law enforcement out of County EMS's office. Id. As Justice was escorted, Plaintiff hugged his neck. Id.

Immediately after Justice's suspension, Christian sent Mallard and other Private EMS employees to County EMS's building with instructions "to evaluate the situation, see if we have any problems and let me know." Id. ¶ 28. Thus, Private EMS and its employees were "given free access" to County EMS's records

related to Plaintiff's job duties, despite neither Mallard nor Private EMS having a formal relationship with Pierce County. Id.

That afternoon, Christian organized a meeting with several County EMS employees, including Plaintiff. See id. ¶ 27. During it, Christian threatened Plaintiff and others by saying that "he could privatize EMS in 15 minutes if [the employees] didn't like what was going on." Id. Christian then introduced Spivey, with whom Plaintiff had just earlier been speaking. Id. Spivey had been informed "a few days before" about Justice's imminent suspension and was announced as the interim Director of County EMS. Id. During the announcement, Plaintiff became emotionally upset and began to cry, and she left the meeting to go into the bathroom. Id. The finance director for the Board of Commissioners, Amy Hitt, followed Plaintiff outside, where Plaintiff again expressed her disagreement with Justice's suspension. Id. Before and after Spivey was promoted, Private EMS was making decisions for County EMS; Christian had told Spivey "to do whatever Derek Mallard told him to do." See Dkt. No. 36-4, Ex. D, at 85.

E. Meetings the Following Two Days

The morning after Justice's suspension, Christian held one-on-one meetings with Plaintiff and other County EMS employees, whom were forced to attend. Dkt. No. 36 ¶ 29. As Plaintiff

AO 72A
(Rev. 8/82)

entered the office for her meeting, Christian remarked, "So I guess you're having a problem with all of this, huh?" Id. When Plaintiff admitted to opposing Justice's suspension, Christian lifted his cell phone and "threatened Plaintiff by saying that he could privatize EMS with one phone call." Id. Later that day, Plaintiff saw Spivey clearing out Justice's office. Id.

The next day, Plaintiff was required to attend another meeting with Christian. Id. ¶ 30. Cady, Spivey, Roberts, and County Commissioner Bill Cselle were also there. Id. During this meeting, which concerned changes at County EMS, Christian commented "that as to any employees who did not agree with any of the changes being made, 'get rid of the troublemakers.'" Id.

F. Mallard's Visit to County EMS

A week after Justice was suspended, Mallard visited County EMS's office to meet with Spivey. Id. ¶ 31. When he entered the building, he approached Plaintiff at her desk and asked about her job duties and what billing programs she used. Id. Afterward, Mallard met privately with Spivey for approximately three hours, and Spivey toured Mallard around the building. Id. Later, Plaintiff expressed her concern to Spivey about losing her job, which was based on Spivey's three-hour meeting with Mallard. Id.

Two days later, on August 17, Plaintiff was required to attend another meeting in Christian's office, which was also

AO 72A
(Rev. 8/82)

attended by Spivey, Roberts, and Niki Varnes, Roberts's secretary and Spivey's girlfriend. Id. ¶ 32. Christian asked for each person's opinion of the changes taking place. Id. When it was Plaintiff's time to speak, she became emotional. Id. Spivey patted her hand and told her to be truthful, to which Plaintiff politely responded that Spivey did not want her to be truthful. Id. She declined to share her feelings. Id.

G. Developments During Medical Leave

1. Miscellaneous Developments

Plaintiff was out of the office for medical reasons from Tuesday, August 21, 2012, until the next Monday, August 27. Id. ¶ 33. During this time, Christian and Pierce County sent Mallard and other Private EMS employees to sift through Plaintiff's files, desk, records, and computer. Id. Also during this time, Pierce County officially terminated Justice's employment. Id.

2. Board of Commissioners and Hiring of Private EMS

On August 24, at a publicly held meeting of the Board of Commissioners, Mallard "falsely alleged" that County EMS had serious billing and coding problems, causing the loss of $250,000 to $300,000 over the previous five years.[5] Id. ¶ 34.

---

[5] Defendants attached the minutes of the August 24, 2012 meeting to their initial motion to dismiss, along with a video of a September 4 meeting, see infra Part I.I. Dkt. Nos. 6-1 to -2, Exs. 1-2. Under the incorporation-by-reference doctrine, a court may consider documents attached to a 12(b)(6) motion as part of the pleadings for the motion's purposes if (1) the

Randy Hodges, an associate of Mallard and Private EMS employee, also "falsely alleged" that improper coding resulted in insurance carriers denying claims. Id. Plaintiff also claims that Mallard insinuated that she was incompetent by "falsely alleg[ing]" that Pierce County's third-party billing consultants had closely watched County EMS's account over the past six months. Id. ¶ 35. Plaintiff believes that these allegations at the Board of Commissioners meeting stood contrary to the state evaluation conducted in June, which made no finding of wrongdoing in its preliminary assessment, and the fact that "actual hands-on billing" was conducted by a third-party billing contractor, EMS Consultants. Id. ¶ 36.

Spivey made similar allegations at the August 24 meeting, in addition to stating that "hearsay" indicated that Justice had instructed Plaintiff to delay collections in the weeks prior to his suspension. Id. ¶¶ 38-39. Spivey mentioned that "some staff members have hinted at leaving the department owing to the

---

complaint refers to the documents, (2) those documents are central to the plaintiff's claim, and (3) the documents' content is undisputed. Brooks v. Blue Cross & Blue Shield of Fla., No. 95-405-CIV, 1995 WL 931702, at *5 (S.D. Fla. Sept. 22, 1995); Harris v. Ivax Corp., 182 F.3d 799, 802 n.2 (11th Cir. 1999); Horsley v. Feldt, 304 F.3d 1125, 1134 (11th Cir. 2002). If these conditions are met, "the defendant's attaching such documents to the motion to dismiss will not require conversion of the motion into a motion for summary judgment." Brooks, 1995 WL 931702, at *5. Defendants' attachments satisfy the prerequisites to be considered without converting their motion into one for summary judgment. In contrast, the Court declines to consider documents—some of which were also attached to Plaintiff's amended complaint, and some of which were not—attached to Plaintiff's response to Defendants' first motion, although the Court notes that their exclusion does not affect the ultimate disposition of Defendants' motion. See Dkt. Nos. 26-1 to -9.

AO 72A
(Rev. 8/82)

situation with Mr. Justice and the talk of privatizing the department." Dkt. No. 6-1, Ex. 1, at 1. Christian then said that if employees "are lying, stealing, cheating or covering up, we don't want them" and that "if we need help staffing the department, [Private EMS] is willing to provide employees to fill those gaps." Id. at 2.

Plaintiff believes that Mallard, Hodges, and Spivey alleged these purported problems to persuade the Board of Commissioners to hire Private EMS as a consultant for County EMS. Dkt. No. 36 ¶¶ 36, 38. Indeed, at the conclusion of the meeting, Pierce County hired Mallard and Private EMS as consultants to "straighten out" billing. Id. ¶¶ 37, 54.

### 3. Varnes's Warning

The same evening, Varnes texted Plaintiff to warn her not to be alarmed when Plaintiff returned to work the next Monday to find Private EMS staff sitting at Plaintiff's desk. Id. ¶ 40. Plaintiff called for clarification, at which point Varnes explained that Pierce County had hired Mallard and Private EMS for billing consulting. Id. Plaintiff expressed frustration with hiring Defendants when County EMS already had a third-party billing consultant. Id.

AO 72A
(Rev. 8/82)

## H. Plaintiff's Return and Termination

When Plaintiff returned to work on August 27, 2012, Private EMS employees were at County EMS's office. Id. ¶ 41. Cady entered the office and asked to speak with Plaintiff in Spivey's office. Id. Cady asked Plaintiff whether "she was ever told by Ken Justice to 'not do the billing so the county would go bankrupt.'" Id. Plaintiff said that suggestion was absurd. Id. "Immediately thereafter, Defendant Cady informed Plaintiff that she was terminated, and he handed her a separation notice."[6] Id.

Prior to Plaintiff's termination, she claims to have never been warned about policy violations or that her job was in jeopardy. Id. ¶ 42. To the contrary, she says that she had been assured numerous times by Christian and Spivey that her job was secure. Id.

## I. Post-Termination Accusations

At a Board of Commissioners meeting on September 4, 2012, Mallard reported that there was $6,200 in undeposited checks spread around a vault, which Plaintiff believes falsely implied malfeasance by Plaintiff. Id. ¶ 44. According to Plaintiff,

---

[6] The separation notice, dated August 27, 2012, is attached to Plaintiff's Complaint. Dkt. No. 36-5, Ex. E. Its stated reason for separation is "Violation of Operational Procedures: Failure to Report." Id. at 1. More specifically, it said, "Employee failed to maintain billing and because of this action resulted in a net loss of potential collections of $815K[.] Employee failed to report that her supervisor gave directed [sic.] not to bill." Id. at 2.

AO 72A
(Rev. 8/82)

there were "only a few checks neatly stacked on [her] desk that could not be deposited until the Board of Commissioners'[s] office had completed a conversion to allow EMS deposits to be made directly into the county's General Fund rather than an account designated solely for [County] EMS." Id. ¶ 45.

Mallard also reported that $818,000 remained uncollected and even more was improperly billed. Id. ¶ 46. Plaintiff claims, however, that all accounts were billed and collected, if feasible, in accordance with County EMS's collection policy, which was validated during the state evaluation. Id. ¶ 47. Lastly, Mallard asserted other alleged falsities, such as him having to submit 288 claims and County EMS being 2 months behind in billing. Id. ¶ 48.

J. Opinion from the State Evaluation

In October 2012, an opinion was issued from the state evaluation conducted in June. Id. ¶ 57. It concluded that County EMS "management had an effective collection policy and procedure in place and followed that policy" and that its policies and procedures for collecting money were "acceptable." Id. ¶¶ 57, 59. It characterized the preexisting third-party billing consultant as a "reputable outside firm" and said outsourcing with them "is likely . . . the best option for Pierce County EMS." Id. ¶ 58. Nevertheless, even after the report was issued, Christian continued to allege that County EMS

failed to bill more than $800,000 and that "it was a bookkeeping nightmare." Id. ¶ 60.

K. Plaintiff's Alleged Injuries

Based on these facts, Plaintiff generally alleges that Spivey, Christian, Mallard, Cady, and Private EMS conspired to defame Plaintiff to achieve Spivey's appointment as County EMS's Director and Private EMS's hiring as a consultant. Id. ¶¶ 49-50. In the several months following Plaintiff's termination, Christian, Mallard, Cady, and Spivey continued to publicly and falsely accuse Plaintiff of not billing at least $250,000 and incorrectly billing approximately $800,000. Id. ¶¶ 55-56. These accusations were published in the newspaper. Id. ¶ 61. Plaintiff claims that these accusations stigmatized her and severely damaged her reputation in the community. Id. ¶¶ 56, 60. She claims that they impeded her from obtaining employment equivalent to what she had at County EMS and that she has so far failed to find a position as a billing clerk. Id. ¶¶ 56, 62.

II. Procedural Background

On August 27, 2013, Plaintiff Debra Harris filed suit[7] in federal court against seven defendants: Pierce County, Georgia; the Pierce County Board of Commissioners; Paul Christian, individually and in his official capacity; James Spivey, individually and in his official capacity; Edward Cady,

---

[7] On June 18, 2013, Plaintiff provided ante litem notice to the Pierce County Board of Commissioners pursuant to O.C.G.A. § 36-11-1. Dkt. No. 36-1, Ex. A.

AO 72A
(Rev. 8/82)

individually and in his official capacity; Okefenokee Emergency
Medical Service, Inc.; and Derek Mallard, individually and in
his official capacity as "Owner/Director" of Okefenokee
Emergency Medical Service, Inc. Dkt. No. 1. The suit asserted
seven claims.[8] Id. ¶¶ 65-107.

One month later, Defendants Mallard and Private EMS filed a
Motion to Dismiss pursuant to Rule 12(b)(6) of the Federal Rules
of Civil Procedure. Dkt. No. 6. This motion was fully briefed.
Dkt. Nos. 6; 26; 29; 37.

In April 2014, Plaintiff filed an amended complaint ("the
Complaint"). The Complaint asserts seven claims: a 42 U.S.C.
§ 1983 claim for violation of Plaintiff's rights to free speech,
due process, reputational liberty, and to be free from unlawful
interference with employment (Count 1); violation of the First
Amendment (Count 2); violation of Plaintiff's Fourteenth
Amendment Right to procedural due process (Count 3); deprivation
of her constitutionally protected reputation (Count 4);
conspiracy to deprive Plaintiff of her constitutional rights
(Count 5); intentional infliction of emotional distress (Count
6); and "defamation/slander/libel" (Count 7). Dkt. No. 36
¶¶ 76-124. All but Count 3 are brought against Defendants
Mallard and Private EMS, among others.

---

[8] This complaint contained a scrivener's error by labeling the seventh listed
count as "Count Eight." Dkt. No. 1, at 17.

On May 7, 2014, Defendants Mallard and Private EMS filed a second Motion to Dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.[9] Dkt. No. 41. Defendants' motion is fully briefed. Dkt. Nos. 41; 47; 48.

## III. Legal Standard

When ruling on a motion to dismiss brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a district court must construe the plaintiff's complaint in the light most favorable to the plaintiff and accept all well-pleaded facts alleged in the complaint as true. Sinaltrainal v. Coca-Cola Co., 578 F.3d 1252, 1260 (11th Cir. 2009). Although a complaint need not contain detailed factual allegations, it must contain sufficient factual material "to raise a right to relief above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). At a minimum, a complaint should "contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." Fin. Sec. Assurance, Inc. v. Stephens, Inc., 500 F.3d 1276, 1282-83 (11th Cir. 2007) (per curiam) (quoting Roe v. Aware Woman Ctr. for Choice, Inc., 253 F.3d 678, 683 (11th Cir. 2001)).

---

[9] Because the initial complaint and motion to dismiss have been superseded, Defendants' first motion to dismiss is **MOOT**. Dkt. No. 6.

AO 72A
(Rev. 8/82)

## IV. Discussion

### A. Claims Under 42 U.S.C. § 1983

Plaintiff asserts three claims under 42 U.S.C. § 1983[10] against Mallard and Private EMS, among others: violation of the First Amendment (Count 2); deprivation of constitutionally protected liberty (Count 4); and conspiracy to deprive Plaintiff of her constitutional rights (Count 5). Dkt. No. 36 ¶¶ 79-89, 96-109.

### 1. State-Actor Analysis

Plaintiff's § 1983 claims require her to show that Mallard and Private EMS acted under color of state law. See Boles v. Riva, 2014 WL 1887376, No. 14-10065, at *1 (11th Cir. May 13, 2014) (per curiam) (stating that, under 42 U.S.C. § 1983, a person may pursue private causes of action "for deprivations of federal rights by persons acting under color of state law"). To obtain relief, a plaintiff "must show (1) that the [defendants] deprived her of a right secured under the Constitution or federal law and (2) that the deprivation occurred under color of state law." Willis v. Univ. Health Servs., Inc., 993 F.2d 837, 840 (11th Cir. 1993).

---

[10] Although Count 1 is listed as a distinct claim in the Complaint, it merely asserts an action generally under 42 U.S.C. § 1983 and serves as an umbrella for Counts 2 through 5. See Dkt. No. 36 ¶¶ 76-78. Therefore, Count 1 is contingent upon the other claims' success and does not warrant individualized analysis.

"Section 1983 liability may only be imposed upon wrongdoers who carry a badge of authority of a State and represent it in some capacity, whether they act in accordance with their authority or misuse it." Roman Catholic Diocese of Rockville Ctr., N.Y. v. Inc. Vill. of Old Westbury, No. 09CV5195(DRH)(ETB), 2011 WL 666252, at *7 (E.D.N.Y. Feb. 14, 2011) (internal quotation marks omitted). "Private actors may be deemed to have acted under color of state law, but 'only in rare circumstances.'" Boles, 2014 WL 1887376, at *1.

Courts employ a variety of tests to determine whether a private party acted under color of state law:

> (1) the public function test,[11] which asks whether the private actors were performing functions traditionally the exclusive prerogative of the state; (2) the state compulsion test, which applies to situations where the government coerced or significantly encouraged the unconstitutional actions at issue; and (3) the nexus/joint action test, which applies where the state and the private party were joint participants in the common enterprise.

Id. In addition, a private person "may be held liable under § 1983 when he conspires with state actors to violate the plaintiff's constitutional rights," which requires evidence of

---

[11] Under the public function test, "state action is shown only when private actors are given powers (or perform functions) that are traditionally the exclusive prerogative of the State." Wellington v. Royal Caribbean Cruises, Ltd., 511 F. App'x 974, 976 (11th Cir. 2013) (emphasis in original) (internal quotation marks omitted). "[V]ery few activities fall within this category [of activities], which includes activities like conducting elections and performing necessary municipal functions." Id. (citing Flagg Bros., Inc. v. Brooks, 436 U.S. 149, 158-59 (1978)).

agreement between the state and private actors. <u>Christman v.</u>
<u>Walsh</u>, 416 F. App'x 841, 845 (11th Cir. 2011) (per curiam)
(citing <u>Rowe v. City of Fort Lauderdale</u>, 279 F.3d 1271, 1283
(11th Cir. 2002)).

a. Parties' Arguments

Plaintiff argues that Defendants acted under color of state
law as willful participants and joint actors with the county
officials to replace County EMS personnel—as evidenced by
Defendants' open access to County EMS's files, Defendants' false
accusations, the meetings and communications between Christian
and Mallard, and Christian directing Spivey to follow Mallard's
directions. Moreover, pursuant to Count 5, Plaintiff argues
that Mallard and Private EMS are liable as co-conspirators of
the alleged constitutional deprivations.[12]

In contrast, Defendants argue that they were mere private
consultants who gave advice—which may or may not have been acted
upon—and that the Complaint is devoid of any allegations that
their consultation caused Plaintiff's termination. In support
of this argument, for example, Defendants note that Plaintiff's
termination predated Defendants' formal report of their
findings. According to Defendants, their actions, bid to

---

[12] Although Plaintiff apparently also argues that the public function test is
satisfied by quasi-governmental authority being implied by Defendants re-
negotiating contracts on the County's behalf, she provides no basis for the
Court to conclude that such an activity is within the "exclusive" prerogative
of the state.

privatize County EMS, and informal discussions with Christian months before Plaintiff's termination do not equate to state action.  In essence, Defendants argue that Plaintiff is attempting to inappropriately prove a conspiracy through innuendo.

b. Nexus/Joint Action and Conspiracy Standards

Under the nexus/joint action test, "the governmental body and private party must be intertwined in a symbiotic relationship" that involves the specific conduct about which the plaintiff complains.  Focus on the Family v. Pinellas Suncoast Transit Auth., 344 F.3d 1263, 1278 (11th Cir. 2003).  Although the "mere fact that a private actor contracts with a governmental entity does not mean that every action taken by the private actor can be attributed to the government," a sufficient "symbiotic relationship" can exist if the state contractually requires the private actor to take particular actions.  Id. at 1278-79.  Moreover, although some courts have held that mere professional advice to the state cannot be considered state action, R-Goshen LLC v. Vill. of Goshen, 289 F. Supp. 2d 441, 445 (S.D.N.Y. 2003), professional advice may support the conclusion that the consultant is a state actor if the consultant has a direct interest in the matter, Watson v. Grady, No. 09-CV-3055 (KMK), 2010 WL 3835047, at *8 n.4 (S.D.N.Y. Sept. 30, 2010).  See also Inc. Vill. of Old Westbury, 2011 WL 666252,

AO 72A
(Rev. 8/82)

at *8-9 (holding that the close nexus test was not satisfied by a private entity "merely" providing professional advice and opinions to a municipality).

In a similar vein, to establish a conspiracy for § 1983's purposes, "the plaintiff must plead in detail, through reference to material facts, the relationship or nature of the conspiracy between the state actor(s) and the private persons." Brown v. Lewis, 361 F. App'x 51, 54 (11th Cir. 2010) (per curiam). "[M]erely string[ing] together" adverse acts of individuals "without showing contacts between the [private and state actors] that could prove [they] had reached an understanding to violate [a plaintiff's] rights" is insufficient to demonstrate the existence of a conspiracy. Harvey v. Harvey, 949 F.2d 1127, 1133 (11th Cir. 1992) (internal quotation marks omitted). "Wholly conclusory allegations of conspiracy must be disregarded." Muhammad v. Bethel-Muhammad, No. 11-0690-WS-B, 2012 WL 1854315, at *7 (S.D. Ala. May 21, 2012) (quoting Am. Dental Ass'n v. Cigna Corp., 605 F.3d 1283, 1294 (11th Cir. 2010)) (internal quotation marks and brackets omitted). However, "conspiracies are by their very nature secretive operations, and may have to be proven by circumstantial, rather than direct, evidence." Adler v. Pataki, 204 F. Supp. 2d 384, 395 (N.D.N.Y. 2002) (quoting Pangburn v. Culbertson, 200 F.3d 65, 72 (2d Cir. 1999)) (internal quotation marks omitted).

AO 72A
(Rev. 8/82)

## c. Application

Taking the Complaint's averments as true and drawing all reasonable inferences in Plaintiff's favor, the Court finds that the allegations satisfy the joint action test and make out an actionable conspiracy to find that Private EMS and Mallard acted under color of state law. Plaintiff has alleged more than Private EMS and Mallard acting as mere consultants. Based on the Complaint's allegations, Defendants' self-interest was in play, as there was a monetary interest vis-à-vis the prospect of contracting with the County for their services. Thus, the allegations plausibly show a direct interest in providing a reason for the Board of Commissioners to alter the provision of EMS services from the status quo ante. Pursuit of this direct interest would have been facilitated by the Complaint's allegations that (A) Defendants had unfettered access to County EMS files, despite the lack of a formal business relationship, (B) Mallard had frequent contacts with Christian about privatization, (C) Christian was apparently reluctant to be transparent about these contacts, and (D) Spivey was directed to follow Mallard's directions—again, despite the lack of a formal business relationship. These allegations do not embody a normal consultancy, but instead a symbiotic web between Christian, Mallard, and Private EMS that colors Defendants with state

action.[13]  Therefore, despite Mallard and Private EMS's statuses as private actors, their actions are properly scrutinized under § 1983.

### 2. Decision-making Authority

Plaintiff argues that Private EMS and Mallard may be held liable for her § 1983 claims, despite the fact that "it was the state and not [a] private actor that committed the allegedly unconstitutional act." Willis v. Ga. Dep't of Juvenile Justice, No. 7:05-cv-59(HL), 2007 WL 2782509, at *8 (M.D. Ga. Sept. 21, 2007).  Typically, liability rests only with those with decision-making authority.  Matthews v. Columbia Cnty., 294 F.3d 1294, 1297 (11th Cir. 2002) (per curiam).

> A "decisionmaker" is someone "who has the power to make official decisions and, thus, be held individually liable.  A "decisionmaker" may often be identified by a rule or by examining the statutory authority of the official alleged to have made the decision.  In the termination context, a "decisionmaker" has the power to terminate an employee, not merely the power to recommend termination.

Kamensky v. Dean, 148 F. App'x 878, 879-80 (11th Cir. 2005) (per curiam) (emphasis in original) (citations omitted).

Although the Eleventh Circuit has not extended individual liability to situations in which a governmental authority "rubber stamps" a recommendation, id. at 880, recent caselaw—

---

[13] In the alternative, the allegations contain sufficient circumstantial facts that plausibly show the existence of a mutual understanding between Christian and Defendants to act toward a common unlawful goal.

relying on Staub v. Proctor Hospital, 131 S. Ct. 1186 (2011)—

suggests that individual liability is appropriately imposed on

an "unlawfully motivated subordinate (the monkey, in the cat's

paw fable) under § 1983." Polion v. City of Greensboro, No. 13-

0244-WS-M, 2014 WL 2611562, at *15 n.16 (S.D. Ala. June 10,

2014); see also Smith v. Bray, 681 F.3d 888, 899 (7th Cir. 2012)

(stating that five other circuits have held that individual

liability under § 1983 is appropriate on this basis); Crutch v.

Lawrence Cnty. Bd. of Educ., No. 3:12-CV-827-PWG, 2012 WL

3030173, at *3 n.4 (N.D. Ala. July 23, 2012) (mitigating

Kamensky's weight of persuasion in light of it being an

unpublished opinion based on a summary judgment record).

### a. Parties' Arguments

Plaintiff argues that Mallard and Private EMS are

responsible for her termination despite not having ultimate

decision-making authority because (A) they freely accessed

County EMS files despite no formal relationship with the County

and (B) Mallard had the "mantle of authority" to conjure false

allegations and cause Plaintiff's termination.

In contrast, Defendants argue that they lacked decision-

making authority, as that was vested exclusively in Christian

and the Board of Commissioners. Instead, according to

Defendants, they were merely consultants, and the Complaint

relies on pure speculation.

AO 72A
(Rev. 8/82)

b. Application

Despite the lack of binding Eleventh Circuit precedent on the issue, the trending majority of authority finds that an unlawfully motivated actor may be properly held liable for a constitutional deprivation, despite the actor's non-status as a decision-maker. Therefore, Defendants' non-status as a decision-maker is not fatal to Plaintiff's § 1983 claims, at least not at this juncture.

3. First Amendment Speech Claim

Count 2 asserts a violation of Plaintiff's First Amendment right to free speech. Dkt. No. 36 ¶¶ 79-89. The Speech Clause of the First Amendment says, "Congress shall make no law . . . abridging the freedom of speech . . . ." U.S. Const. amend I. "The First Amendment, as incorporated through the Due Process Clause of the Fourteenth Amendment, applies to state and municipal governments, state-created entities, and state and municipal employees." Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1268 (11th Cir. 2004) (citations omitted).

"A state employer can not retaliate against a state employee for engaging in speech constitutionally protected under the First Amendment." Stanley v. City of Dalton, 219 F.3d 1280, 1288 (11th Cir. 2000). In assessing such a claim, the Eleventh Circuit has adopted the following four-step framework:

> [T]he employee must show by a preponderance
> of the evidence that: (1) the employee's
> speech is on a matter of public concern; (2)
> the employee's first amendment interest in
> engaging in the speech outweighs the
> employer's interest in prohibiting the
> speech in order to promote the efficiency of
> the public services it performs through its
> employees; and (3) the employee's speech
> played a substantial part in the employer's
> decision to demote or discharge the
> employee. If the employee succeeds in
> showing the preceding factors, the employer
> must prove by a preponderance of the
> evidence that (4) it would have reached the
> same decision even in the absence of the
> protected conduct.

Id. (ellipsis and internal quotation marks omitted)

a. Public Concern Analysis

First, Plaintiff must show that her speech was on a matter of public concern. To make this showing, the speech "must relate to any matter of political, social, or other concern to the community." Id. at 1288 n.13 (quoting Connick v. Myers, 461 U.S. 138, 146 (1983)) (brackets and internal quotation marks omitted). The caselaw draws a distinction between speech involving personal interests versus public interests:

> If the government employee speaks not as a
> citizen upon matters of public concern, but
> instead as an employee upon matters only of
> personal interest, absent the most unusual
> circumstances, a federal court is not the
> appropriate forum in which to review the
> wisdom of a personnel decision taken by a
> public agency allegedly in reaction to the
> employee's behavior. Because an employee's
> speech will rarely be entirely private or
> entirely public, the main thrust of the

> employee's speech must be determined. This
> determination is made by examining the
> content, form, and context of a given
> statement, as revealed by the whole record.
> When there is a personal element to the
> speech, complaints of wrongdoing within a
> public agency may not constitute speech on a
> matter of public concern.

Id. (emphasis added) (citations, brackets, and internal

quotation marks omitted); see also Pattee v. Ga. Ports Auth.,

477 F. Supp. 2d 1253, 1263 (S.D. Ga. 2006) ("If the main thrust

of the speech was for private gain, the speech will not be

considered to be on a matter of public concern, seemingly no

matter how strong the other factors weigh in favor of

characterizing the speech as a matter of public concern.").

Thus, "when public employees make statements pursuant to their

official duties, the employees are not speaking as citizens for

First Amendment purposes, and the Constitution does not insulate

their communications from employer discipline."[14]  Callahan v.

Fermon, 526 F.3d 1040, 1044 (7th Cir. 2008) (emphasis in

original) (quoting Garcetti v. Ceballos, 547 U.S. 410, 421

---

[14] The mere fact that speech is "made to coworkers or to supervisors rather than directed at the general public does not remove the speech from the category of public concern" if there is a cognizable public interest motivating the speech, such as concern about the public's safety.  Cook v. Gwinnett Cnty. Sch. Dist., 414 F.3d 1313, 1319 (11th Cir. 2005); see also Pattee, 477 F. Supp. 2d at 1263 ("[A] disclosure of perceived governmental failures to an entity in a position to correct them is akin to a public disclosure."); Myles v. Richmond Cnty. Bd. of Educ., 267 F. App'x 898, 900 (11th Cir. 2008) (per curiam) ("An employee's failure to address her complaints to the public does not automatically mean they were not on a matter of public concern; nonetheless, the employee's attempt at public disclosure is a relevant factor in making the determination.").  Moreover, "an employee's motive for speech, while not dispositive, is a factor that must be considered in determining whether speech is a matter of public concern."  Morris v. Crow, 117 F.3d 449, 457 (11th Cir. 1997) (per curiam).

(2006)). In other words, "[t]he controlling factor . . . is whether the speech 'owes its existence to a public employee's professional responsibilities.'" Id. at 1044 (quoting Garcetti, 547 U.S. at 421).

There are nine instances that possibly involve protected speech by Plaintiff:

- In February 2012, in a large crowd of fire personnel, EMS personnel, and others supporting Justice at a Board of Commissioners meeting, Plaintiff "expressed to several of the persons in attendance in the audience her support for Ken Justice, her opposition to the proposal to remove him [from certain positions], and her opposition to privatization of the Pierce County EMS." Dkt. No. 36 ¶ 23.

- "Prior to August 8, 2012, Plaintiff spoke on several occasions with Defendant Spivey concerning the proposed privatization" and her opposition to any such effort. Id. ¶ 25.

- On the morning of August 8, 2012, Plaintiff told Spivey, Cady, and Roberts about her disagreement with Justice's suspension. Id. ¶ 26.

- Later that afternoon on August 8, 2012, at a meeting called by Christian in which he announced Spivey's promotion, Plaintiff became upset and, outside of others' presence, discussed Justice's suspension with Hitt. Id. ¶ 27.

- On August 9, 2012, at a one-on-one meeting called by Christian, Plaintiff expressed her opposition to Justice's suspension. Id. ¶ 29.

- On August 15, 2012, after a meeting between Spivey and Mallard, Plaintiff "expressed to Defendant Spivey her concerns about the possible loss of her job due to" Spivey and Mallard's long meeting and rumors of privatization. Id. ¶ 31.

- On August 17, 2012, at a meeting in Christian's office that Plaintiff was required to attend, Plaintiff became emotional and politely declined to share her feelings about the "changes taking place." Id. ¶ 32.

- In the evening of August 24, 2012, Plaintiff called Varnes for an explanation of why Private EMS employees would be at the office on Monday and expressed her "frustration" about Private EMS being hired despite County EMS already having a third-party billing consultant. Id. ¶ 40.

- On August 27, 2012, Cady initiated a meeting in which Plaintiff was terminated and Cady asked Plaintiff whether Justice told her "to not do the billing so the county would go bankrupt," to which Plaintiff denied as absurd. Id. ¶ 41.

AO 72A
(Rev. 8/82)

As to all instances of speech on or after August 9, 2012, they clearly fail to touch on a matter of public concern because either (A) the statements were made pursuant to Plaintiff's official duties and responsive to communication initiated by others, see id. ¶¶ 29, 32, 40-41 or (B) the thrust of the speech was for Plaintiff's own personal gain, see id. ¶¶ 31, 40. These instances owe their existence to Plaintiff's professional responsibilities rather than her civic responsibilities.

In contrast, as to the instances of speech alleged to have occurred on or before August 8, 2012, the allegations are not extensively detailed, but one could plausibly infer that the instances touched on a matter of public concern and would exist despite Plaintiff's professional responsibilities. Most notably, the February 2012 speech could have touched on a community concern, as indicated by its timing being coincident with a governmental deliberation and the speech's audience consisting of a group of (currently unspecified) individuals located in a public, non-work forum. Although not expressly stated, it is reasonably inferable that the speech occurred during non-working hours, not to work peers, and was motivated by concern for the public's well-being rather than Plaintiff's personal interest. Therefore, the Complaint alleges facts satisfying the public-concern prong.

b. <u>Pickering</u>[15] Analysis

Second, Plaintiff must show that the balance between her free speech interests and the government's interests are in her favor. To strike a balance between an employee's free speech interests and the government's interest in promoting efficient public services, a court considers "(1) whether the speech at issue impedes the government's ability to perform its duties efficiently, (2) the manner, time, and place of the speech, and (3) the context within which the speech was made." <u>Stanley</u>, 219 F.3d at 1289. For example, it is relevant "whether the speech at issue 'impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes performance of the speaker's duties or interferes with the regular operation of the public employer's enterprise.'" <u>Morris v. Crow</u>, 117 F.3d 449, 457-58 (11th Cir. 1997) (per curiam) (brackets omitted) (quoting <u>Rankin v. McPherson</u>, 483 U.S. 378, 388 (1987)); <u>see also id.</u> at 458 (reasoning that speech did not touch on a public concern where the employee used "disrespectful, demeaning, rude, and insulting" language to a superior "in full view of her co-workers"). This inquiry requires a "careful balancing of competing interests on a case-by-case basis." <u>Stanley</u>, 219 F.3d at 1289.

---

[15] <u>Pickering v. Bd. of Educ.</u>, 391 U.S. 563 (1968).

AO 72A
(Rev. 8/82)

As with the first element, Plaintiff has pleaded facts with which it could be plausibly found that her interests outweighed the government's interests. Again, the February 2012 speech provides the strongest case. From the allegations, the Court reasonably infers that the government's ability to perform was unaffected, as implied by the manner, time, and place of the speech at a public gathering coincident with a Board of Commissioners meeting. Moreover, there is nothing implying that Plaintiff's speech was rude, disrespectful, or otherwise insubordinate as to interfere with the efficient provision of government services. Weighing against this weak government interest is a potentially weighty interest for public citizens to comment on the merits of agency privatization and budgetary concerns.[16] Therefore, the Complaint's allegations satisfy the <u>Pickering</u> prong.

### c. Substantial Part Analysis

Third, Plaintiff must show that her speech played a substantial part in her termination. To conduct this inquiry, "a court must examine the record as a whole to ascertain whether the plaintiff presented sufficient evidence for a reasonable

---

[16] To a lesser degree, the other pre-August 8 incidents of speech could support a finding that Plaintiff's free speech interests outweighed the government's interests. The Complaint's allegations suggest that Plaintiff was never harsh or disruptive to the office's operations, but only was vocal about a community concern. Despite the work-hour timing and work-based audience of the speech, it is possible that the context and content were appropriate so that Plaintiff's interests were supreme.

jury to conclude her protected speech was a substantial motivating factor in the decision to terminate her." Kamensky, 148 F. App'x at 881. The burden to show this is not heavy, and it is not subject to any single standard. Id. However, the Eleventh Circuit has identified several relevant factors, none of which is outcome determinative and all of which must be taken into account:

> (1) the temporal proximity between the termination and the protected activity; (2) whether any reasons for the termination were pretextual; (3) whether any comments made, or actions taken, by the employer indicate the discharge was related to the protected speech; (4) whether the asserted reason for the discharge varied; and (5) any circumstantial evidence of causation, including such facts as [i] who initiated any internal investigations or termination proceedings, [ii] whether there is evidence of management hostility to the speech in question, or [iii] whether the employer had a motive to retaliate.

Id. As to the temporal-proximity factor, there is no per se rule on the length of time necessary to create an inference, although causation is inferred where termination closely follows protected activity. Id.

Taking all reasonable inferences in Plaintiff's favor, the balance of the factors could weigh for Plaintiff that her speech was a substantial motivating factor for her termination. The temporal proximity between the February 2012 speech and her termination was approximately six months. This time gap,

standing alone, would be insufficient to show causation.  See

Higdon v. Jackson, 393 F.3d 1211, 1221 (11th Cir. 2004) ("By

itself, the three month period . . . does not allow a reasonable

inference of a causal relation between the protected expression

and the adverse action."); Batts v. Silver Line Bldg. Prods.

Corp., No. 1:08-CV-3355-WSD-ECS, 2010 WL 966860, at *13 (N.D.

Ga. Feb. 22, 2010) (reasoning that a five-to-six month gap

between protected activity and alleged instances of retaliation

was insufficient, by itself, to show causation).  However, with

the continuation of plausibly protected speech over the

subsequent months and in the months preceding Plaintiff's

termination, the inference of causation is stronger.  See, e.g.,

Russaw v. Barbour Cnty. Bd. of Educ., 891 F. Supp. 2d 1281, 1292

(M.D. Ala. 2012) (reasoning that a two-month gap between an

adverse employment action and protected conduct is sufficient to

support a prima facie case of causation based on temporal

proximity).  Moreover, causation can be inferred from other

considerations.  See Robinson v. LaFarge N. Am., Inc., 240 F.

App'x 824, 828-29 (11th Cir. 2007) (per curiam) ("[G]aps of

time, standing alone, do not preclude a plaintiff from producing

enough evidence for a reasonable jury to conclude that protected

speech was a substantial factor in the adverse employment

decision." (brackets omitted)); Batts, 2010 WL 966860, at *13

AO 72A
(Rev. 8/82)

("[C]lose temporal proximity is not the only means by which a plaintiff can establish a causal connection.").

The key premise to Plaintiff's claims is that the reasons for her termination were pretexts based on concocted falsities about her job performance. Although the official reason for Plaintiff's termination never varied, several comments by the alleged co-conspirators (but primarily Christian) indicate that the discharge could have been related to the protected speech. True, there is no explicit allegation that Private EMS or Mallard knew of Plaintiff's protected speech, but the Complaint shows that Mallard and Christian had initiated discussions as far back as July 2011 and that, in the months following these initial talks, Mallard was aware of the internal controversy at County EMS. Based on the other allegations supporting the conclusion that Mallard, Private EMS, and the other defendants had a close relationship or are properly considered co-conspirators, it is reasonable to infer that Mallard and Private EMS were aware of (A) any material developments within County EMS and (B) Plaintiff's vocal opposition to privatization and Justice's suspension. For the purpose of Defendants' motion to dismiss, these facts are sufficient to show causality and establish a plausible claim for violation of Plaintiff's free

AO 72A
(Rev. 8/82)

speech rights.[17]  Therefore, as to Count 2, Defendants' motion is

**DENIED**.

                    4. Reputational Liberty Claim

     Count 4 asserts a claim for "deprivation of

constitutionally protected reputational liberty."  Dkt. No. 36,

at 28.  A procedural due process claim for deprivation of

liberty may be actionable under 42 U.S.C. § 1983 if

"reputational damage is sustained in connection with a

termination of employment."  <u>Allen v. Ga. Dep't of Human Res.</u>,

No. 5:05-CV-36(DF), 2006 WL 2263987, at *3 (M.D. Ga. Aug. 8,

2006) (citing <u>Cotton v. Jackson</u>, 216 F.3d 1328, 1330 (11th Cir.

2000)).  Such a claim requires a claimant to prove the

following: "(1) a false statement (2) of a stigmatizing nature

(3) attending a governmental employee's discharge (4) made

public (5) by the governmental employer (6) without a meaningful

opportunity for employee name clearing."  <u>Buxton v. City of</u>

<u>Plant City</u>, 871 F.2d 1037, 1042-43 (11th Cir. 1989) (footnotes

omitted).

---

[17] As to the fourth prong, the burden is on the employer to prove by a
preponderance of the evidence that it would have reached the same decision to
terminate Plaintiff in the absence of her protected speech.  <u>Stanley</u>, 219
F.3d at 1288.  Therefore, the Complaint's failure to specifically aver to
this effect does not prejudice Plaintiff's claim for the purposes of
Defendants' motion to dismiss.  Moreover, to the degree that the purported
reason for Plaintiff's termination was conjured in response to her
purportedly protected speech, it is clear that the decision to terminate
would not have been reached but for the protected speech.

As to the sixth element, "[i]f adequate state remedies were available but the plaintiff failed to take advantage of them, the plaintiff cannot rely on that failure to claim that the state deprived him of procedural due process." Cotton, 216 F.3d at 1331. This requirement ensures that a state has an opportunity to remedy an alleged procedural failure in an appropriate forum before being subject to such a claim. Id. Courts have held that—even without any specific legal remedy under Georgia law—an individual whose reputational liberty is allegedly harmed is "entitled to initiate a mandamus proceeding for the purpose of seeking [a] name-clearing hearing" under O.C.G.A. § 9-6-20. Allen, 2006 WL 2263987, at *5; Cotton, 216 F.3d at 1332-33; A.A.A. Always Open Bail Bonds, Inc. v. DeKalb Cnty., 129 F. App'x 522, 525-26 (11th Cir. 2005) (per curiam). Failure to do so deprives a claimant of an actionable cause of action. Allen, 2006 WL 2263987, at *5.

Plaintiff argues that her claim should not be barred by her failure to bring a name-clearing hearing because such a hearing would have compromised her other claims' viability vis-à-vis "judgment by estoppel" under O.C.G.A. § 9-12-40.[18] Dkt. No. 47, at 21-22. In effect, she does not dispute the availability of a

---

[18] Under O.C.G.A. § 9-12-40, "[a] judgment of a court of competent jurisdiction shall be conclusive between the same parties and their privies as to all matters put in issue or which under the rules of law might have been put in issue in the cause wherein the judgment was rendered until the judgment is reversed or set aside."

AO 72A
(Rev. 8/82)

name-clearing proceeding but instead asks the Court to excuse her from satisfying this claim's element.

Simply put, Plaintiff's claim fails because she has not shown that she lacked a meaningful opportunity to clear her name. She cites no legal authority in support of her contention that initiating a mandamus proceeding would eviscerate any opportunity to bring her other claims. Although O.C.G.A. § 9-12-40 estops a party from subsequently raising any "matters put in issue or which under the rules of law might have been put in issue in the cause wherein the judgment was rendered," the Court finds no basis in finding that a narrowly directed mandamus proceeding could contemplate the variety of claims brought here, thereby triggering estoppel. Therefore, Count 4 is **DISMISSED**.

### 4. Conspiracy Claim

Count 5 asserts a "conspiracy to deprive Plaintiff of her constitutional rights" under 42 U.S.C. § 1983.[19] Dkt. No. 36, at 30. To prove a § 1983 conspiracy, "a plaintiff must show that the parties reached an understanding to deny the plaintiff his or her rights and prove an actionable wrong to support the conspiracy." Bailey v. Bd. of Cnty. Comm'rs of Alachua Cnty., 956 F.2d 1112, 1122 (11th Cir. 1992) (quoting Bendiburg v. Dempsey, 909 F.2d 463, 468 (11th Cir. 1990)) (brackets and internal quotation marks omitted). Thus, there must be an

---

[19] Nowhere does Plaintiff argue for the existence of a conspiracy under 42 U.S.C. § 1985. See Dkt. Nos. 26; 36; 47.

AO 72A
(Rev. 8/82)

underlying constitutional infirmity from which this claim derives and evidence of an agreement between defendants. Rowe, 279 F.3d at 1283. Moreover, as stated supra Part IV.A.1.b., to establish a conspiracy for § 1983's purposes, "the plaintiff must plead in detail, through reference to material facts, the relationship or nature of the conspiracy between the state actor(s) and the private persons." Brown, 361 F. App'x at 54.

As stated supra Part IV.A.1.c., the Complaint plausibly alleges the existence of a conspiracy between Mallard, Private EMS, and the other defendants. Second, as reasoned supra Part IV.A.3, there is an actionable underlying § 1983 claim from which Count 5 is properly derived. Therefore, as to Count 5, Defendants' motion is **DENIED**.

B. Claim for Defamation

Count 7 asserts a claim against Mallard and Private EMS, among others, for "defamation/slander/libel." Dkt. No. 36 ¶¶ 119-23. The underlying statements at issue involve "imput[ing] a crime to Plaintiff" and "falsely claiming" that Plaintiff "failed to properly discharge her duties; failed to bill over $800,000 correctly; accepted falsified documents; failed to properly process billings; [and] engaged in other activities that were not true."[20] Id. ¶¶ 121-22.

---

[20] Although Defendants argue that Plaintiff has failed to demonstrate the falsity of these statements, Defendants misconstrue Plaintiff's burden in responding to their motion to dismiss.

Defamation entails four elements:

> (1) a false and defamatory statement
> concerning the plaintiff; (2) an
> unprivileged communication to a third party;
> (3) fault by the defendant amounting at
> least to negligence; and (4) special harm or
> the "actionability of the statement
> irrespective of special harm."

Mathis v. Cannon, 276 Ga. 16, 20-21(2) (2002). The law of defamation distinguishes between libel and slander. Slander (or oral defamation) consists of "[m]aking charges against another in reference to his trade, office, or profession, calculated to injure him therein" or "[u]ttering any disparaging words productive of special damage which flows naturally therefrom." O.C.G.A. § 51-5-4(a). Libel (or written defamation) is "a false and malicious defamation of another, expressed in print, writing, pictures, or signs, tending to injure the reputation of the person and exposing him to public hatred, contempt, or ridicule." O.C.G.A. § 51-5-1(a). Both theories of defamation may plausibly underlie this action, as the statements were made orally and apparently memorialized in handouts at the Board of Commissioners meetings.[21]  See Dkt. No. 6-3, Ex. 2.

---

[21] Indeed, the parties do not contest whether libel or slander exclusively underlies the action, and Count 7 is titled "Defamation/Slander/Libel."  Dkt. No. 36, at 33.

1. "Concerning the Plaintiff"

Pursuant to the first element in sustaining a defamation action, a degree of specificity is required in regard to ascertaining whom the words reference:

> The allegedly defamatory words must refer to some ascertained or ascertainable person, and that person must be the plaintiff. If the words used really contain no reflection on any particular individual, no averment or innuendo can make them defamatory. An innuendo can not make the person certain which was uncertain before.

Fiske v. Stockton, 171 Ga. App. 601, 602(1) (1984). For example, where an advertisement states that "some company," which sells a product without any trademark, is giving customers a "run-around" and other companies sell the product, an action for defamation fails as a matter of law. Armscorp of Am., Inc. v. Daugherty, 191 Ga. App. 19, 19 (1989). In making this assessment, a court constructs a statement's meaning through the eyes of an average reader. Cox Enters., Inc. v. Bakin, 206 Ga. App. 813, 817(1) (1992). A reader's subjective decision to impute innuendo is not actionable as defamation. Id.

Mallard and Private EMS are purportedly responsible for making the following statements:

- "[T]here are serious problems with the EMS billing and coding which ha[s] caused Pierce County to lose large sums of money over the last 5 years." Dkt. No. 36 ¶ 34.

- "[T]here was at least $250,000.00 to $300,000.00 lost due to billing errors." Id.

- "[I]mproper coding of bills at Pierce County EMS had resulted in insurance carriers denying claims." Id.

- "Pierce County EMS had been watched very closely by Pierce County's third-party billing consultants over the past six months." Id. ¶ 35. In making these false allegations, Mallard insinuated that Plaintiff was incompetent. Id.

- "[T]here were checks totaling $6,200.00 spread around in the vault that had not been deposited . . . ." Id. ¶ 44.

- "[T]here was about $818,000 that had not been collected and even more that had been billed improperly by the Pierce County Emergency Medical Services." Id. ¶ 46.

- "288 claims had not been submitted and [Mallard] had to submit them." Id. ¶ 48.

- "Pierce County EMS was 2 months behind in billing." Id.

- "Throughout the next several months [after September 2012], . . . Mallard . . . publicly and falsely accused Plaintiff of not billing at least $250,000 and possibly not correctly billing approximately $800,000 in emergency medical services." Id. ¶ 55.

The parties contest whether the statements at issue are actionable as referencing Plaintiff. Plaintiff admits that

Defendants, in making some of these statements, never specifically identified Plaintiff, but instead County EMS generally. Nevertheless, Plaintiff posits that her identity was readily ascertainable by implication and that she was specifically mentioned on at least one occasion. Dkt. No. 26, at 20.

Drawing all reasonable inferences in Plaintiff's favor, it is plausible that the aforementioned statements can be objectively found to reference Plaintiff despite no specific mention of her. Defendants identified several purported billing improprieties, and Plaintiff's responsibility is inferred from her acting as the "billing clerk for the Pierce County EMS" who was "responsible" for certain critical functions. Dkt. No. 36 ¶ 16. Indeed, she was the "sole individual" responsible for transmitting certain information. Id. Moreover, beyond the statements casting blame generally on County EMS, the Complaint states that there were instances in which Plaintiff specifically was defamed. See id. ¶¶ 35, 55.

### 2. Privilege from Suit

The claim requires a showing that the statements at issue were unprivileged communications to a third party. The parties contest whether Defendants' communications were privileged.

Under Georgia law, a statement may be conditionally privileged, unless it was maliciously uttered.[22] Rabun v. McCoy, 273 Ga. App. 311, 316(2) (2005). A communication is privileged if it is "made in good faith in the performance of a public duty," "made in good faith in the performance of a legal or moral private duty," or "made with a good faith intent on the part of the speaker to protect his or her interest in a matter in which it is concerned." O.C.G.A. § 51-5-7. To warrant the benefit of such a privilege, however, the speaker must show "[1] good faith, [2] an interest to be upheld, [3] a statement properly limited in its scope, [4] a proper occasion, and [5] publication to proper persons." Hammer v. Slater, 20 F.3d 1137, 1141 (11th Cir. 1994) (quoting Camp v. Maddox, 93 Ga. App. 646, 649(3) (1956)). The burden of proving a claim of privilege rests with the party seeking to use the privilege. Chaney v. Harrison & Lynam, LLC, 308 Ga. App. 808, 814(1c) (2011).

At this stage, the Court cannot conclude that Defendants' communications were privileged. Although they may have spoken in good faith on a matter in which they were concerned, Plaintiff alleges otherwise. Taking the Complaint's allegations as true, Mallard and Private EMS's statements were motivated by

---

[22] "In every case of privileged communications, if the privilege is used merely as a cloak for venting private malice and not bona fide in promotion of the object for which the privilege is granted, the party defamed shall have a right of action." O.C.G.A. § 51-5-9. Substantively, "[i]n all actions for printed or spoken defamation, malice is inferred from the character of the charge." O.C.G.A. § 51-5-5.

malice, "meaning that the 'allegedly defamatory matter was uttered with knowledge that it was false or reckless disregard for whether it was true or false.'"[23] Stroman v. Bank of Am. Corp., 852 F. Supp. 2d 1366, 1378 (N.D. Ga. 2012) (quoting Hammer, 20 F.3d at 1142). This is sufficient to overcome any claim of privilege.

### 3. Culpability

Although at least negligence is required to sustain a defamation action, Mathis, 276 Ga. at 20(2), there are instances in which a claim for libel requires "a plaintiff to allege facts indicating actual malice," Stroman, 852 F. Supp. 2d at 1378. Pursuant to the discussion supra Part IV.B.2, the Complaint pleads allegations that satisfy this element.

### 4. Defamatory Nature and Resulting Harm

The defamatory nature of statements and harm that must be proven involve an overlapping inquiry. A statement can be defamatory per se or per quod. McGinnis v. Am. Home Mortg. Servicing Inc., No. 5:11-CV-284(CAR), 2013 WL 3338922, at *17 (M.D. Ga. July 2, 2013). A false statement is per se defamatory if it involves "a false statement that one is guilty of a crime, dishonesty or immorality or that tends to injure one in his trade or business." McGowan v. Homeward Residential, Inc., 500

---

[23] "Georgia courts have explained reckless disregard as whether the defendant entertained serious doubts as to the truth of his publication." Hammer, 20 F.3d at 1142 (internal quotation marks omitted).

AO 72A
(Rev. 8/82)

F. App'x 882, 886 (11th Cir. 2012) (per curiam) (quoting <u>Zarach v. Atlanta Claims Ass'n</u>, 231 Ga. App. 685, 688(2) (1998)) (alterations and internal quotation marks omitted). To determine whether words are defamatory as a matter of law, a court "must rely upon the words themselves" rather than "hunt for strained constructions." <u>Zarach</u>, 231 Ga. App. at 688(2). The words must be "recognized as injurious on their face—without the aid of extrinsic proof." <u>Id.</u> If a statement is per se defamatory, special damages need not be pleaded.[24] <u>See</u> <u>McGowan</u>, 500 F. App'x at 885 (stating that for a libel claim under Georgia law, a plaintiff "must plead a false statement that either: (1) is libel per se; or (2) caused [the plaintiff] to suffer special damages").

Defendants argue that the statements were not defamatory because they, at worst, reveal that an accounting showed money had not been—but still could be—collected. This argument is wholly without merit. The statements at issue charged that County EMS (and plausibly Plaintiff by implication) had "serious" billing problems, had sloppy and untimely procedures, required close supervision, and caused money to be lost. These

---

[24] "Defamation not amounting to slander per se or libel per se requires proof of special damages." <u>McGinnis</u>, 2013 WL 3338922, at *18. In such a case, a plaintiff must plead special damages under Rule 9(g)'s heightened pleading standard. <u>McGowan</u>, 500 F. App'x at 886. This requires that "an item of special damage" to "be specifically stated." Fed. R. Civ. Proc. 9(g). "The special damages necessary to support an action for defamation . . . must be the loss of money[] or of some other material temporal advantage capable of being assessed in monetary value." <u>Webster v. Wilkins</u>, 217 Ga. App. 194, 196(2) (1995).

allegations, on their face, are defamatory per se because they injure Plaintiff's professional reputation. Therefore, as to Count 7, Defendants' motion is **DENIED**.

   C. Claim for Intentional Infliction of Emotional Distress

   Count 6 asserts a claim against Mallard and Private EMS, among others, for intentional infliction of emotional distress. Dkt. No. 36 ¶¶ 110-11, 113-118. The cited actions that are purportedly extreme and outrageous include "denigrating the Plaintiff in public meetings; making defamatory statements regarding the Plaintiff's job performance to the Pierce County Board of Commissioners and the public and various newspapers; terminating the Plaintiff's employment with Pierce County; and failing to grant her a hearing on her dismissal or a name clearing hearing." Id. ¶ 114.

   To succeed on this claim, Plaintiff must establish four elements: "(1) The conduct must be intentional or reckless; (2) The conduct must be extreme and outrageous; (3) There must be a causal connection between the wrongful conduct and the emotional distress; [and] (4) The emotional distress must be severe." Hendrix v. Phillips, 207 Ga. App. 394, 395(1) (1993) (quoting Bridges v. Winn-Dixie Atlanta, Inc., 176 Ga. App. 227, 230(1) (1985)).

   Plaintiff's primary deficiency is her failure to show the second element. This element requires a showing that

Defendants' conduct was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Phinazee v. Interstate Nationalease, Inc., 237 Ga. App. 39, 40 (1999) (quoting Bowers v. Estep, 204 Ga. App. 615, 618(2) (1992)); see also Restatement (Third) of Torts: Physical & Emotional Harm § 46 cmt. d (2012) (noting that the "extreme and outrageous" element "requires both that the character of the conduct be outrageous and that the conduct be sufficiently unusual to be extreme"). Indeed, in Georgia:

> [It is] held that outrageous conduct sufficient to justify a claim of intentional infliction of emotional distress "does not include mere insults, indignities, threats, annoyances, petty oppressions, or other vicissitudes of daily living. Plaintiffs are expected to be hardened to a certain amount of rough language and to occasional acts that are definitely inconsiderate and unkind."

Ghodrati v. Stearnes, 314 Ga. App. 321, 323 (2012) (quoting Wilcher v. Confederate Packaging, Inc., 287 Ga. App. 451, 454(2) (2007)); see also Northside Hosp., Inc. v. Ruotanen, 246 Ga. App. 433, 434-35 (2000) (stating that rude behavior to the family of a deceased person was not sufficiently egregious). This is an objective standard, in which "the evidence must show that reasonable persons might find the presence of extreme and

outrageous conduct." Clark v. Coats & Clark, Inc., 990 F.2d 1217, 1229 (11th Cir. 1993). A determination on this element is a question of law. Hill v. City of Fort Valley, 251 Ga. App. 615, 616(1a) (2001).

In response to Defendants' motion, Plaintiff cites no legal authority to explain how the Complaint's allegations constitute extreme and outrageous conduct. Dkt. No. 26, at 24-26. Instead, she apparently relies on the facts as patently "extreme and outrageous." Id. Specifically, she alleges that Mallard falsely accused Plaintiff of doing her job improperly and provided information to Christian that facilitated her termination. Id. at 25. These purportedly false allegations were then publicized in the local newspaper and were motivated by Mallard and Private EMS's desire to take over County EMS's operations. Id. at 25-26.

The facts alleged do not constitute extreme and outrageous conduct.[25] Indeed, "Georgia courts have held that an employer's termination of an employee—however stressful to the employee—generally is not extreme and outrageous conduct." Clark, 990 F.2d at 1229. Nor are performance evaluations, regardless of their brutal harshness or whether they are accompanied with a

---

[25] Moreover, the factual basis for the claim is largely subsumed by Plaintiff's other counts. Cf. Peterson v. Merscorp Holdings, Inc., No. 1:12-cv-00014-JEC, 2012 WL 3961211, at *6 (N.D. Ga. Sept. 10, 2012) ("[P]laintiffs' claim for intentional infliction of emotional distress seems largely subsumed by their claim for wrongful foreclosure. Plaintiffs' claim for intentional infliction of emotional distress is therefore **DISMISSED**.").

false accusation.  *Jarrard v. United Parcel Serv., Inc.*, 242 Ga. App. 58, 59-60 (2000).  Although Defendants' actions were not "performance evaluations" in their normal sense and were allegedly tainted with falsehoods, Plaintiff's accusations, taken as true, do not show actions that "go beyond all possible bounds of decency" and are properly "regarded as atrocious, and utterly intolerable in a civilized community."  *Phinazee*, 237 Ga. App. at 40.  Therefore, this claim is **DISMISSED.**

## V. Conclusion

For the aforementioned reasons, Defendants' first Motion to Dismiss is **MOOT,** and their second Motion to Dismiss is **DENIED IN PART** and **GRANTED IN PART.**  Dkt. Nos. 6; 41.

**SO ORDERED,** this 14TH day of August, 2014.

LISA GODBEY WOOD, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA